ELECTRONICALLY FILED
Superior Court of California,
County of Alameda
11/20/2023 at 03:15:14 PM
By: Lynetta Irvin,
Deputy Clerk

1  John L. Langdoc, Esq. (C.S.B. #235509)
     jlangdoc@kazanlaw.com
2  Henry A. Steinberg, Esq. (C.S.B. #285998)
     hsteinberg@kazanlaw.com
3  KAZAN, McCLAIN, SATTERLEY & GREENWOOD
   A Professional Law Corporation
4  Jack London Market
   55 Harrison Street, Suite 400
5  Oakland, California 94607
   Telephone: (510) 302-1000
6  Facsimile:  (510) 835-4913

7  Attorneys for Plaintiffs

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                        COUNTY OF ALAMEDA

10  JAMES SARJEANT; and                    Case No.  23CV052439

11  LUCRETIA SARJEANT,                     **COMPLAINT FOR PERSONAL
                                           INJURIES AND LOSS OF CONSORTIUM**
12              Plaintiffs,
                                           **DEMAND FOR JURY TRIAL**
13       vs.

14  CITY OF LONG BEACH;

15  ALLIED FLUID PRODUCTS CORP.,
16  formerly known as ALLIED PACKING &
    SUPPLY, INC.;

17  AMELCO CORPORATION individually, and
18  as parent, alter-ego, equitable trustee, joint
    venture, and as successor-in-interest to
19  AMELCO CORPORATION, AMELCO
    INDUSTRIES, and SMITH-AMELCO;

20  AMELCO INDUSTRIES;
21
    AMERICAN PRESIDENT LINES, LLC
22  individually, and as parent, alter-ego, equitable
    trustee, and as successor-in-interest to
23  AMERICAN PRESIDENT LINES, LTD, and
    AMERICAN MAIL LINE, LTD;
24
    BASCO DRYWALL & PAINTING CO.;
25
    DAP, INC. k/n/a LA MIRADA PRODUCTS
26  CO., INC.;

27  DAP PRODUCTS INC.;

28  DINERS CLUB INTERNATIONAL LTD.,

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

3289005.2

formerly known as THE DINERS CLUB, INC., sued individually and as alter-ego, parent, equitable trustee, and successor-in-interest to DQM CORPORATION;

FLACKSGROUP LLC, sued individually, as alter-ego of, and as successor-in-interest to KELLY-MOORE PAINT COMPANY, INC.;

FOSTER WHEELER LLC;

GENERAL ELECTRIC COMPANY;

GRINNELL LLC;

HERRICK STEEL, INC., sued individually and as alter-ego, parent, equitable trustee, and joint venture with TECHNI-BUILDERS, INC.;

HILL BROTHERS CHEMICAL COMPANY;

IMO INDUSTRIES INC., individually and as successor-in-interest, parent, alter ego and equitable trustee of DELAVAL STEAM TURBINE CO.;

KAISER GYPSUM COMPANY, INC.;

KELLY-MOORE PAINT COMPANY, INC.;

KM INDUSTRIES HOLDING CO., INC., formerly known as KELLY-MOORE PAINT COMPANY, INC.;

METALCLAD INSULATION LLC, individually and as successor-by-merger, successor-in-interest, parent, alter ego and equitable trustee of METALCLAD INSULATION CORPORATION;

OWL COMPANIES individually, and as parent, alter-ego, equitable trustee, joint venture and as successor-in-interest to SMITH-AMELCO and OWL CONSTRUCTORS, formerly known as H.C. SMITH CONSTRUCTION CO.;

PARAMOUNT GLOBAL, formerly known as VIACOMCBS INC., formerly known as CBS CORPORATION, a Delaware Corporation, formerly known as VIACOM, INC., successor by merger to CBS CORPORATION, a Pennsylvania Corporation, formerly known as WESTINGHOUSE ELECTRIC

Kazan, McClain, Satterley & Greenwood

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1  CORPORATION;

2  PFIZER INC.;

3  SYD CARPENTER, MARINE
   CONTRACTOR, INC.;

4

5  VANDERBILT MINERALS, LLC, sued
   individually, as alter-ego of, and as successor-
   in-interest to R.T. VANDERBILT

6  COMPANY, INC. and INTERNATIONAL
   TALC COMPANY, INC.;

7

8  and

9  FIRST DOE through ONE HUNDREDTH
   DOE,

10            Defendants.

11

## GENERAL BACKGROUND

### I.

**The Plaintiffs**: James Sarjeant ("Plaintiff" herein) is the physically injured Plaintiff. He has malignant mesothelioma that was caused by his cumulative exposures to asbestos, asbestiform fibers, and asbestiform talc – collectively referred to herein as asbestos – including the asbestos exposures for which Defendants bear responsibility. Plaintiff's spouse is Lucretia Sarjeant. They live in California.

### II.

**The Defendants**: All Defendants are listed in the case caption. The true names of the Defendants sued as DOE's are unknown to Plaintiffs. Each Defendant was the agent, employee, or joint venturer of its co-defendants and acted in the full course and scope of the agency, employment, or joint venture. For some liability theories, the Defendants are classified as follows:

| Classification | Defendant |
|---|---|
| Products Liability Defendants | ALLIED FLUID PRODUCTS CORP., formerly known as ALLIED PACKING & SUPPLY, INC.; |
| | AMELCO CORPORATION individually, and as parent, alter-ego, equitable trustee, joint venture, and as successor-in-interest to AMELCO CORPORATION, AMELCO INDUSTRIES, and SMITH-AMELCO; |

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

**Kazan, McClain, Satterley & Greenwood**

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

AMELCO INDUSTRIES;

AMERICAN PRESIDENT LINES, LLC individually, and as parent, alter-ego, equitable trustee, and as successor-in-interest to AMERICAN PRESIDENT LINES, LTD, and AMERICAN MAIL LINE, LTD;

BASCO DRYWALL & PAINTING CO.;

DAP, INC. k/n/a LA MIRADA PRODUCTS CO., INC.;

DAP PRODUCTS INC.;

DINERS CLUB INTERNATIONAL LTD., formerly known as THE DINERS CLUB, INC., sued individually and as alter-ego, parent, equitable trustee, and successor-in-interest to DQM CORPORATION;

FLACKSGROUP LLC, sued individually, as alter-ego of, and as successor-in-interest to KELLY-MOORE PAINT COMPANY, INC.;

FOSTER WHEELER LLC;

GENERAL ELECTRIC COMPANY;

GRINNELL LLC;

HERRICK STEEL, INC., sued individually and as alter-ego, parent, equitable trustee, and joint venture with TECHNI-BUILDERS, INC.;

HILL BROTHERS CHEMICAL COMPANY;

IMO INDUSTRIES INC., individually and as successor-in-interest, parent, alter ego and equitable trustee of DELAVAL STEAM TURBINE CO.;

KAISER GYPSUM COMPANY, INC.;

KELLY-MOORE PAINT COMPANY, INC.;

KM INDUSTRIES HOLDING CO., INC., formerly known as KELLY-MOORE PAINT COMPANY, INC.;

METALCLAD INSULATION LLC, individually and as successor-by-merger, successor-in-interest, parent, alter ego and equitable trustee of METALCLAD INSULATION CORPORATION;

OWL COMPANIES individually, and as parent, alter-ego, equitable trustee, joint venture and as successor-in-interest to SMITH-AMELCO and OWL CONSTRUCTORS, formerly known as H.C. SMITH CONSTRUCTION CO.;

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

| | |
|---|---|
| | PARAMOUNT GLOBAL, formerly known as VIACOMCBS INC., formerly known as CBS CORPORATION, a Delaware Corporation, formerly known as VIACOM, INC., successor by merger to CBS CORPORATION, a Pennsylvania Corporation, formerly known as WESTINGHOUSE ELECTRIC CORPORATION; |
| | PFIZER INC.; |
| | SYD CARPENTER, MARINE CONTRACTOR, INC.; |
| | VANDERBILT MINERALS, LLC, sued individually, as alter-ego of, and as successor-in-interest to R.T. VANDERBILT COMPANY, INC. and INTERNATIONAL TALC COMPANY, INC.; |
| | and |
| | FIRST DOE through ONE HUNDREDTH DOE, |
| Conduct Defendants | AMELCO CORPORATION individually, and as parent, alter-ego, equitable trustee, joint venture, and as successor-in-interest to AMELCO CORPORATION, AMELCO INDUSTRIES, and SMITH-AMELCO; |
| | AMELCO INDUSTRIES; |
| | AMERICAN PRESIDENT LINES, LLC individually, and as parent, alter-ego, equitable trustee, and as successor-in-interest to AMERICAN PRESIDENT LINES, LTD, and AMERICAN MAIL LINE, LTD; |
| | BASCO DRYWALL & PAINTING CO.; |
| | DINERS CLUB INTERNATIONAL LTD., formerly known as THE DINERS CLUB, INC., sued individually and as alter-ego, parent, equitable trustee, and successor-in-interest to DQM CORPORATION; |
| | FOSTER WHEELER LLC; |
| | GENERAL ELECTRIC COMPANY; |
| | GRINNELL LLC; |
| | HERRICK STEEL, INC., sued individually and as alter-ego, parent, equitable trustee, and joint venture with TECHNI-BUILDERS, INC.; |
| | IMO INDUSTRIES INC., individually and as successor-in-interest, parent, alter ego and equitable trustee of DELAVAL STEAM TURBINE CO.; |
| | METALCLAD INSULATION LLC, individually and as |

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

| | |
|---|---|
| | successor-by-merger, successor-in-interest, parent, alter ego and equitable trustee of METALCLAD INSULATION CORPORATION; |
| | OWL COMPANIES individually, and as parent, alter-ego, equitable trustee, joint venture and as successor-in-interest to SMITH-AMELCO and OWL CONSTRUCTORS, formerly known as H.C. SMITH CONSTRUCTION CO.; |
| | PARAMOUNT GLOBAL, formerly known as VIACOMCBS INC., formerly known as CBS CORPORATION, a Delaware Corporation, formerly known as VIACOM, INC., successor by merger to CBS CORPORATION, a Pennsylvania Corporation, formerly known as WESTINGHOUSE ELECTRIC CORPORATION; |
| | SYD CARPENTER, MARINE CONTRACTOR, INC.; |
| | and |
| | FIRST DOE through ONE HUNDREDTH DOE, |

**III**.

**Alternate Entities**: All Defendants are individually liable for their defective products and wrongful conduct, and some Defendants are liable for the defective products and wrongful conduct of their alternate entities. Each such Defendant is liable for the torts of each of its alternate entities because:

- there were express or implied agreements between the companies to transfer and assume the liabilities;

- the transactions between the companies amounted to a consolidation or merger;

- the purchasing company is a mere continuation of the seller;

- the transfer of assets to the purchasing company was for the fraudulent purpose of escaping liability for the seller's debts;

- strict products liability was transferred because (1) there was a virtual destruction of Plaintiffs' remedies against the original manufacturer caused by the successor's acquisition of the business, (2) the successor has the ability to assume the original manufacturer's risk-spreading role, and (3) it is fair to require the successor to assume responsibility for defective products that was a burden necessarily attached to the original manufacturer's goodwill being enjoyed by the successor in the continued operation of the business; and

- the companies are alter egos because (1) there is such a unity of interest,

ownership, and business operations between the companies that their separate personalities do not in reality exist, and (2) there would be an inequitable result if the torts in question were treated as those of one company alone.

The identities of the Defendants and their alternate entities are as follows:

| Defendant | Alternate Entities |
|---|---|
| AMELCO CORPORATION | AMELCO CORPORATION; AMELCO INDUSTRIES; and SMITH-AMELCO |
| AMERICAN PRESIDENT LINES, LLC | AMERICAN PRESIDENT LINES, LTD, and AMERICAN MAIL LINE, LTD |
| DINERS CLUB INTERNATIONAL LTD. | THE DINERS CLUB, INC. and DQM CORPORATION |
| FLACKSGROUP LLC | KELLY-MOORE PAINT COMPANY, INC. |
| HERRICK STEEL, INC. | TECHNI-BUILDERS, INC. |
| IMO INDUSTRIES INC. | DELAVAL STEAM TURBINE CO. |
| KM INDUSTRIES HOLDING CO., INC. | KELLY-MOORE PAINT COMPANY, INC. |
| METALCLAD INSULATION LLC | METALCLAD INSULATION CORPORATION |
| OWL COMPANIES | SMITH-AMELCO, and OWL CONSTRUCTORS, formerly known as H.C. SMITH CONSTRUCTION CO. |
| PARAMOUNT GLOBAL, formerly known as VIACOMCBS INC., formerly known as CBS CORPORATION, a Delaware Corporation, formerly known as VIACOM, INC. | CBS CORPORATION, a Pennsylvania Corporation, formerly known as WESTINGHOUSE ELECTRIC CORPORATION |
| VANDERBILT MINERALS, LLC | R.T. VANDERBILT COMPANY, INC. and INTERNATIONAL TALC COMPANY, INC. |

**IV**.

**Venue**: Venue is proper in Alameda County because certain Defendants reside in Alameda County.

**V**.

**The Asbestos Exposures**: Plaintiff was exposed in California to significant levels of asbestos dust working with and around asbestos containing products, from the 1960s, 1970s, 1980s and potentially into the 1990s, Plaintiff was exposed in California to asbestos fibers because

Kazan, McClain, Satterley & Greenwood

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

of his work with and around asbestos containing products; Plaintiff was exposed to asbestos fibers from home remodel in California between the 1960s and the 1990s to products like joint compound, drywall texture, ceiling texture, drywall, and caulking; Plaintiff worked at the Todd Shipyard in the 1950s and 1960s around ship parts that contained asbestos; and during the 1960s and potentially into the 1970 Plaintiff worked in Long Beach on the *Queen Mary* as it was being converted to a tourist attraction and hotel and was around demolition and removal of ship parts that contained asbestos, as well as around the men of other contractors on the job who were disturbing ship parts that contained asbestos. Plaintiff's above-described asbestos exposures occurred because of Defendants' products that were sold in California; and because of Defendants' conduct that occurred in, and/or that was directed toward, California. At all times, Defendants purposefully availed themselves of the California market, through marketing and sales of Defendants' relevant products, and through Defendants' relevant conduct. Additionally, Defendants are "at home" in California, because California is one of their largest, if not the largest, markets in the United States; and because certain Defendants reside in California.

**VI**.

**The Harm**: Plaintiff has malignant mesothelioma caused by his exposures to asbestos. The mesothelioma has caused and will cause, Plaintiff to experience financial harm. The mesothelioma also has caused and will cause, Plaintiff to experience physical pain, mental suffering, loss of enjoyment of life, disfigurement, physical impairment, inconvenience, grief, anxiety, humiliation, emotional distress, and other similar harm. And the mesothelioma will cause Plaintiff's untimely death.

Plaintiff's injuries have caused, and will cause, Lucretia Sarjeant to experience loss of consortium. Her harm includes the loss of love, companionship, comfort, care, assistance, protection, affection, society, moral support, sexual relations, and other similar harm.

Plaintiffs rely upon the liability theories described below.

**VII**.

**State-of-the-Art Knowledge of Asbestos Hazards**: The following facts are illustrative, but not exhaustive, of the evolution of the knowledge of the health hazards of asbestos and what

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

was known and knowable to Defendants:

1. Health hazards from asbestos exposure were identified in the 1890's. During this time, the Lady Inspector of Factories in Great Britain noted that individuals working with asbestos were suffering various lung injuries.

2. Defendants since the early 1900's possessed medical and scientific data that raised concerns regarding the presence of asbestos in talcum powder and that demonstrated the existence of health hazards to those exposed to asbestos-containing talcum powder products. Talc is a hydrous magnesium silicate, an inorganic material that is mined from the earth. Talc is used in the manufacture of goods such as paper, plastic, paint and coatings, rubber, food, electric cable, ceramics, and cosmetics. In its loose form and as used in consumer powder products, talc is known as "talcum powder."

3. Geologists and mining companies, including Defendants, have long known that the deposits in the earth that are associated with talc are also associated with the formation of asbestos. Asbestos is a commercial and legal term, rather than a geological or scientific term, referring to six now-regulated magnesium silicate minerals that occur in fibrous form, including the serpentine mineral chrysotile, and the amphibole minerals actinolite, anthophyllite, tremolite, amosite, and crocidolite. The United States Geological Survey on Commercial Talc production in 1965, as well as those dating back to the 1800's in the United States, note the presence of tremolite, anthophyllite, and chrysotile commonly among those minerals found within talc deposits.

4. As early as the 1920's, the term "asbestosis" was used to describe pulmonary fibrosis caused by asbestos exposure. Case reports in Great Britain and the United States detailed asbestosis in various workers.

5. By 1929, lawsuits for disability related to exposure to asbestos were filed against Johns Manville.

6. In the late 1930's, case reports were published addressing the relationship between asbestos and cancer.

7. Several reports, studies, and guidelines published as early as the 1930's, including California's Dust, Fumes, Vapors, and Gases Safety Orders, all recognized that asbestos is a dust which creates health hazards, and that certain precautions are required to mitigate human exposure to dust. Such measures include, but are not limited to, using water to suppress the dust at its source, as well as providing those who might be exposed to dust with adequate ventilation, showers, and changing facilities. These same measures that were recommended to protect workers from asbestosis in the 1930's would also have substantially reduced the risk that bystanders, household members, and other persons would contract mesothelioma from inhaling asbestos-containing dust that those who worked with and around asbestos and asbestos-containing products carried into their households on their person and personal effects. Defendants, and each of them, knew or should have known that anyone, including household members of those who used asbestos-containing products were at risk of developing an asbestos-related disease after inhaling dust from such asbestos-containing products.

**Kazan, McClain, Satterley & Greenwood**
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

**Kazan, McClain, Satterley & Greenwood**
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

8.    In 1931, the United Kingdom allowed workers to receive compensation for asbestosis.

9.    In March of 1933, Waldemar C. Dreesen of the United States Public Health Service reported to the National Safety Council the results of a study conducted among tremolite, talc, and slate workers. The study indicated that the talc was a hydrous calcium magnesium silicate, being 45 percent talc and 45 percent tremolite, and the National Safety Council stated, "[t]he results of the study seemed to indicate a relationship between the amount of dust inhaled and the effect of this dust on the lungs of the workers."

10.   As early as 1934, the National Safety Council was publishing information stating that "a cause of severe pulmonary injury is asbestos, a silicate of magnesium."

11.   In the September 1935 issue of National Safety News, an article entitled *No Halfway Measures in Dust Control* by Arthur S. Johnson reported lowered lung capacity resulting from "asbestosis" and "similar conditions" that developed "from exposure to excess of many mineral dusts relatively low in free silica content." The article further noted that claims for disabilities from workers who alleged exposure to "clay, talc, emery, and carborundum dusts" had "claims prosecuted successfully." The article concluded that "[i]n the absence of adequate diagnoses, occupational histories and a more satisfactory method of adjudicating claims than prosecution at common law, we must conclude that it is necessary to find a practical method for controlling all mineral dusts."

12.   In 1936, California's Division of Industrial Safety issued Safety Orders establishing the standard of care for work with asbestos.

13.   Also in 1936, Illinois enacted legislation recognizing asbestosis as a compensable occupational disease under its Occupational Disease Act.

14.   By the 1940's, asbestos carcinogenicity was noted in reviews in fields of industrial medicine, cancer research, and pneumoconiosis.

15.   In 1946, the American Conference of Governmental Industrial Hygienists established a maximum allowable concentration for occupational exposure.

16.   During the 1940's and 1950's, asbestos hazards were discussed in popular magazines, including Scientific American (January 1949) and Newsweek (May 15, 1950), as well as the Encyclopedia Britannica (1952). On April 7, 1959, the Los Angeles Times and Wall Street Journal reported that California health officials did additional research linking asbestos with cancer. Following a number of subsequent reports in the New York Times, Paul Brodeur published a series of articles in the New Yorker.

17.   In addition, beginning in the 1940's and 1950's, it was recognized that individuals who worked with asbestos materials, as well as those who did not work directly with asbestos products but only had relatively brief or intermittent exposures to asbestos products, could develop fatal asbestos diseases.

18.   In 1955, Richard Doll published a study linking asbestos to lung cancer.

Kazan, McClain, Satterley & Greenwood

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607

(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

19. In 1960, Chris Wagner published a study linking asbestos to mesothelioma.

20. In the early 1960's, Dr. Irving Selikoff engaged in studies of groups of asbestos workers. By 1965, he had conducted various studies, published several articles, conducted special scientific symposia, been interviewed by the New York Times, and organized the international conference on the "Biological Effects of Asbestos" under the auspices of the renowned New York Academy of Sciences. The results of these presentations were published in Volume 132 of the Annals of the New York Academy of Sciences published in 1965.

21. In 1968, a study presented at the American Industrial Hygiene Conference and published in the American Industrial Hygiene Association Journal concluded that "[a]ll of the 22 talcum products analyzed have a...fiber content...averaging 19%. The fibrous material was predominantly talc but contained minor amounts of tremolite, anthophyllite, and chrysotile as these are often present in fibrous talc mineral deposits...Unknown significant amounts of such materials in products that may be used without precautions may create an unsuspected problem." [Cralley, L.J., et al., *Fibrous and Mineral Content of Cosmetic Talcum Products*, 29 Am. Ind. Hyg. Assoc. J. 350 (1968).]

22. In 1969, product-liability lawsuits were brought against asbestos manufacturers. Also, under the Walsh Healy Act, federal contractors with contracts of more than $10,000 were required to adhere to a workplace standard of no more than 12 fibers per cubic centimeter of air.

23. In 1970, OSHA established the first Federal guidelines for workplace asbestos exposure, which took effect in 1971. Those regulations did not identify any known safe level of exposure for asbestos and mesothelioma. The OSHA asbestos regulations were strengthened during the 1970's and 1980's; and by 1986 the regulations explained: (1) the legally "permissible" levels for workplace asbestos exposures, even at just 0.2 f/cc, actually were inadequate to protect people against the risk of mesothelioma and lung cancer; (2) for carcinogens including asbestos, "no safe threshold level was demonstrable"; and (3) mesothelioma and lung cancer developed even after "low cumulative exposures to asbestos."

24. In 1972, the private American Conference of Governmental Industrial Hygienists listed asbestos as a carcinogen. Those industry standards did not identify any known safe level of exposure for asbestos and mesothelioma.

25. A 1976 follow-up study conducted by researchers at Mt. Sinai concluded that "[t]he presence in these products of asbestiform anthophyllite and tremolite, chrysotile, and quartz indicates the need for a regulatory standard for cosmetic talc...We also recommend that evaluation be made to determine the possible health hazards associated with the use of these products." [Rohl, A.N., et al., *Consumer Talcums and Powders: Mineral and Chemical Characterization*, 2 J. Toxicol. Environ. Health 255 (1976).] The results of the Mount Sinai study were soon picked up and reported by both the New York Times and the Washington Post that same year. The study and subsequent newspaper articles listed explicitly popular consumer cosmetic talcum powders as containing high percentages of asbestos.

26.     In the early 1970's, the Food and Drug Administration ("FDA") began an inquiry into whether to regulate and require warnings on consumer talcum powder products. Defendants, who were part of an exclusive lobbying and advocacy group representing companies engaged in the cosmetic products industry, repeatedly conspired and worked in concert to block efforts to label and warn consumers regarding the dangers associated with cosmetic talcum powder products.

27.     The OSHA asbestos regulations were strengthened during the 1970's and 1980's; and by 1986 the regulations explained: (1) the legally "permissible" levels for workplace asbestos exposures, even at just 0.2 f/cc, actually were inadequate to protect people against the risk of mesothelioma and lung cancer; (2) for carcinogens including asbestos, "no safe threshold level was demonstrable"; and (3) mesothelioma and lung cancer developed even after "low cumulative exposures to asbestos."

## VIII.

**Additional Allegations as to KAISER GYPSUM COMPANY, INC.**: The following facts are illustrative, but not exhaustive, of Kaiser Gypsum's wrongful conduct.

a)     From the 1950s to at least 1976, Kaiser Gypsum's products contained intentionally added asbestos; and thereafter the products still contained asbestos-containing talc. In its verified discovery responses, Kaiser Gypsum admits that its joint compounds and acoustical ceiling tiles contained asbestos from the 1950s through 1976. As to joint compounds, Kaiser Gypsum used raw asbestos from Union Carbide and other entities. Union Carbide's corporate representative, Jack Walsh, testified that Kaiser Gypsum was among the top four customers for Union Carbide's Calidria asbestos.

b)     Kaiser Gypsum knew its asbestos-containing products caused cancer. In June 2004, Kaiser Gypsum's longtime employee and designated corporate representative George Kirk testified about Kaiser Gypsum's knowledge of its asbestos-containing products' health hazards. Mr. Kirk worked for Kaiser Gypsum from 1949 through 1974.

c)     By 1953, Kaiser Gypsum had started to develop a joint-compound product for use with its drywall materials. In 1954, after some test batches of asbestos-free joint compound, Kaiser Gypsum decided to include asbestos as an ingredient of its production version to improve the product's performance. Mr. Kirk participated in the company's decision to use asbestos in its joint

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

compound, and he was the person who first met with Johns-Manville's asbestos salesman. As of

1955, Kaiser Gypsum's joint compound contained asbestos.

d)      In addition to his normal duties, Mr. Kirk represented Kaiser Gypsum in national

trade organizations including the Gypsum Association from 1956 through the early 1970s. In

1965, Kaiser Gypsum received from the Gypsum Association a report pertaining to asbestos-

related health hazards. Kaiser Gypsum's management circulated the report via a March 1, 1965

interoffice memorandum. The memorandum noted that people should wear proper respirators to

protect against asbestos dust. The report itself further noted that people exposed to asbestos-

containing products have an increased risk for lung cancer and mesothelioma. In response, Kaiser

Gypsum's own factory personnel began to wear respirators when working with asbestos. Those

employees wore respirators through at least 1974.

e)      Mr. Kirk and his team also began their own research into the dangers of asbestos

exposure. Not until 1971 did Kaiser Gypsum begin to consider whether to remove asbestos from

its joint compound and other products. The company received federal OSHA's emergency

asbestos-exposure standard in 1971; and OSHA's formal exposure and warning regulation in

1972. In the fall of 1972, Kaiser Gypsum formalized its plan to begin replacing asbestos over time.

f)      In late 1972, Kaiser Gypsum allegedly placed some asbestos information on some

of its product packaging. It never advised that respirators should be used, and never warned of

cancer. Kaiser Gypsum waited until 1973 to begin testing asbestos-free versions of its products.

Mr. Kirk testified that "it was a struggle" because "[a]sbestos was a very difficult material to

replace."

g)      In 1974, Kaiser Gypsum continued to sell asbestos-containing joint compound

because the asbestos-free version performed poorly in the field. Kaiser Gypsum's products were

not asbestos-free until at least the end of 1975.

h)      Mr. Kirk testified about numerous interoffice memoranda showing Kaiser

Gypsum's asbestos knowledge and knowing disregard for its users' health and safety:

1.      March 29, 1966: This memorandum was addressed to all safety supervisors

and it indicated that inhalation of asbestos dust causes cancer. It again advised that everyone in the

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

Kazan, McClain, Satterley & Greenwood

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1  vicinity of asbestos dust should wear a respirator. This document resulted in no warnings to

2  product users.

3      2.    <u>April 20, 1967</u>: This document concerned a safety review of Kaiser

4  Gypsum's St. Helens plant. It again noted that asbestos-exposed employees should wear

5  respirators.

6      3.    <u>January 28, 1971</u>: This discussed a safety review of Kaiser Gypsum's

7  Jacksonville plant. It described the asbestos-cancer hazards created by dusty work practices and

8  inadequate ventilation, and that respirators were only a partial solution.

9      4.    <u>November 5, 1971</u>: Entitled "Asbestos Fiber," this memorandum listed the

10  amount of asbestos included in Kaiser Gypsum's joint compound, topping compound, and other

11  products. It expressed concern that a potential government ban on such asbestos-containing

12  products would leave the company without any asbestos-free alternatives to sell. Kaiser Gypsum

13  had not yet begun any effort to eliminate asbestos. Also by 1971, Kaiser Gypsum's salesmen had

14  started receiving questions about whether the joint compound posed any asbestos-related hazards.

15      5.    <u>November 18, 1971</u>: Entitled "Asbestos Fiber – Ecology,"  this

16  memorandum outlined Kaiser Gypsum's plan to solicit asbestos hazard information from its

17  suppliers of raw asbestos fiber. It further discussed how such information should be conveyed to

18  the people in Kaiser Gypsum's plants.

19      6.    <u>February 24, 1972</u>: This discussed "Airborne Pollutants, Especially

20  Asbestos." It reviewed the federal government's potential ban on Kaiser Gypsum's asbestos-

21  containing joint compound. The Environmental Protection Agency was concerned with, "exposure

22  of persons to products without having any idea of what the ingredients are."

23      7.    <u>September 28, 1972</u>: This involved the asbestos-related label that would be

24  applied to certain asbestos-containing products. The label would have satisfied OSHA rules, but

25  did not mention cancer or death. The memorandum expressly directed <u>not</u> to warn of the hazards

26  of mixing or sanding the products. Kaiser Gypsum expected construction workers to find a copy

27  of the Code of Federal Regulations if they wanted to know more about asbestos hazards. But

28  Kaiser Gypsum's actual reason for not adequately warning was that, as Mr. Kirk acknowledged,

1   the joint compound physically could not be mixed or used without creating dust.

2       8.   <u>November 24, 1972</u>: This addressed Kaiser Gypsum's product packaging. A

3   suggested label pertaining to asbestos would have addressed the need for respirators when

4   dumping bags, mixing or sanding of joint compound.

5       9.   <u>November 27, 1972</u>: Unlike the memorandum from three days earlier, this

6   memorandum modified the asbestos label by eliminating all reference to respirators, dumping,

7   mixing or sanding. The more detailed version was never used on any Kaiser Gypsum product.

8       10.   <u>May 17, 1973</u>: This also discussed the asbestos labels that would be applied

9   to certain Kaiser Gypsum products. It asked the plant managers how many labels they needed for

10   their existing unmarked inventory. Kaiser Gypsum sold at least some products bearing the

11   asbestos label, without warning of the need for respirators, and its salesmen complained that sales

12   could be hurt.

13       11.   <u>March 1, 1974</u>: Entitled, "Dust from Joint Compound Job Operations," this

14   memorandum described the elevated asbestos-exposure levels from using joint compound,

15   including Kaiser Gypsum's products. Instead of adopting the Gypsum Association's

16   recommendation of using stronger asbestos language, it was suggested that Kaiser Gypsum should

17   remove all asbestos information from pre-mixed joint compound. "Our company is the only major

18   company carrying the asbestos warning on its premix **and it is costing us business**."

19       12.   <u>April 5, 1974</u>: Entitled, "Joint Compound – Asbestos," the memorandum

20   referenced a Wall Street Journal article that highlighted the asbestos hazards of the product, and

21   noted that sales were suffering in New York City. It stated, "The label warning of the asbestos

22   content appears to be worse than the actual material itself."

23       13.   <u>April 8, 1974</u>: This inquired whether the company had any research

24   program under way to eliminate asbestos from the joint compound

25       14.   <u>May 28, 1974</u>: This discussed an inspection of Kaiser Gypsum's Seattle

26   plant. It noted that a test batch of asbestos-free topping compound had performed well, and

27   recommended further field testing. Mr. Kirk explained that Kaiser Gypsum eventually made

28   asbestos-free joint compound by substituting safe alternatives including cellulose fiber and clay

**Kazan, McClain, Satterley & Greenwood**
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

15. <u>June 11, 1974</u>: This addressed asbestos-free topping compound. It noted that the formula had performed well in initial tests, and that it would eliminate users' asbestos exposures during sanding.

16. <u>July 9, 1974</u>: This reviewed asbestos air samples taken at the company's Delanco plant. It advised that the asbestos-exposed workers should continue to wear respirators.

17. <u>December 9, 1974:</u> This described asbestos-free product testing done in Arizona. The asbestos-free topping compound performed well and would be sold in that market.

18. <u>January 24, 1975</u>: This summarized Kaiser Gypsum's asbestos-replacement status. On the West Coast, testing of asbestos-free products was still underway. On the East Coast, testing had not yet begun.

19. <u>June 26, 1975</u> : This again described the status on the West Coast. Asbestos-free joint compound and topping compound had been successfully developed and were approved for manufacture at the company's Santa Ana plant.

i) Kaiser Gypsum willfully failed to inform and protect customers about its products' asbestos content and its associated health hazards. In 1988, former Kaiser Gypsum salesman John Crum testified about Kaiser Gypsum's complete lack of asbestos warnings on its West Coast joint compound packaging. Mr. Crum was the physically injured plaintiff in his mesothelioma lawsuit. In 1964, Mr. Crum went to work for Kaiser Gypsum as a salesman covering the region of Northern California and Nevada. Mr. Crum sold all Kaiser Gypsum drywall products, including joint compound. The products were sold for residential and commercial construction projects. Mr. Crum received commendations for his high sales figures in 1965 and 1972, including the 1972 Salesman of the Year award.  He continued selling the joint compound through 1975, encompassing 10,000 packages between 1972 and 1975 alone. Mr. Crum never saw any asbestos information on any Kaiser Gypsum product between 1972 and 1975. Nor did Kaiser Gypsum verbally inform Mr. Crum that its joint compounds contained asbestos or were dangerous.

j) Mr. Crum's testimony comports with the testimony of another former Kaiser Gypsum salesman, Brentwood Crosby. Mr. Crosby first worked for Kaiser Gypsum in 1960. From 1962 through 1978, Mr. Crosby worked as a salesman and sales manager who ultimately

Kazan, McClain, Satterley & Greenwood

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1   supervised the whole region of Northern California, Northern Nevada, Utah, Southeastern Idaho,

2   Oregon and Washington. Mr. Crosby supervised the sale of approximately 250,000 packages of

3   joint compound, and he never saw any label or heard any verbal warning from Kaiser Gypsum

4   about asbestos or asbestos-related health hazards.

5          k)      Mr. Crosby's testimony also reveals that Kaiser Gypsum concealed the asbestos

6   content of its joint compounds. During Mr. Crosby's career at Kaiser Gypsum, George Kirk was

7   in charge of research and development. Mr. Crosby relied on Mr. Kirk and his staff to provide

8   information when the salesmen fielded customers' questions and complaints about Kaiser

9   Gypsum's products.  In the late 1960s and 1970, Mr. Crosby became concerned about whether

10  Kaiser Gypsum's drywall products, including joint compound, contained asbestos. Customers had

11  directly asked that question of the salesmen, so Mr. Crosby asked Mr. Kirk for the answer. Mr.

12  Kirk (falsely) said "No," the products did not contain asbestos. A Kaiser Gypsum manufacturing

13  specialist, Mr. Raffaelli, provided the same answer to Mr. Crosby. Mr. Crosby relied on those

14  statements and passed them along to his salesmen, who expressed relief because asbestos content

15  would hurt sales.

16         Further, Kaiser Gypsum owed Plaintiff a duty to disclose facts regarding the asbestos

17  hazards of Kaiser Gypsum's products because Kaiser Gypsum was in an indirect commercial

18  relationship with Plaintiff, his employers, and other trades at the jobsites, whereby they purchased

19  Kaiser Gypsum's products.

20                                            **IX**.

21         **Additional Allegations as to KELLY-MOORE PAINT COMPANY, INC.**; **KM**

22  **INDUSTRIES HOLDING CO., INC., formerly known as KELLY-MOORE PAINT**

23  **COMPANY, INC.**; and **FLACKSGROUP LLC, sued individually, as alter-ego of, and as**

24  **successor-in-interest to KELLY-MOORE PAINT COMPANY, INC.;** (together "Kelly-

25  Moore".) The following facts are illustrative, but not exhaustive, of Kelly-Moore's wrongful

26  conduct.

27         a)      A Kelly-Moore entity is a California corporation.

28         b)      From 1960 until at least 1978, Kelly-Moore, through its alternate entity Paco

1  Textures, manufactured numerous products, including joint compound and texture products,

2  composed of at least six percent chrysotile asbestos by weight, as well as asbestos-containing talc

3  thereafter.

4          c)      Kelly-Moore knew at all relevant times that construction workers and other persons

5  exposed to its asbestos-containing products were at risk of disease and injury, including cancer,

6  and that workers like Plaintiff would experience "high incidences of cancer, lung disease, and skin

7  irritation".

8          d)      As set forth herein, despite the known toxicity of asbestos to persons working with

9  asbestos-containing compounds as well as employees involved in manufacturing those

10  compounds, and despite OSHA having issued an alert to sanding joints in drywall construction as

11  a potential source of exposure to asbestos fibers, Kelly-Moore continued to intentionally add

12  asbestos to most of its Paco brand joint compound products, and to sell asbestos-containing

13  products whenever and wherever it could do so without violating the law.

14          e)      As set forth herein, Kelly-Moore represented to customers and end users that its

15  products were safe and appropriate for their expected and intended use when they were not; and

16  falsely represented that the products were not hazardous, by omitting warnings entirely or by

17  carefully phrasing warnings to obscure and minimize the hazards known to Kelly-Moore. Kelly-

18  Moore did so knowing and intending that its customers and end users would receive these active

19  misrepresentations and fraudulent and misleading statements intended to conceal the hazards of

20  those products, so that customers and end users would purchase and use its products as opposed to

21  its competitors' products, and so that it could profit from the sales of these products, including

22  existing asbestos-containing inventory that remained in Kelly-Moore's possession after it could no

23  longer manufacture them or sell them in all domestic markets.

24          f)      At all relevant times, Kelly-Moore was keenly aware of competition from other

25  manufacturers of asbestos-containing joint compounds, texture compounds, acoustic materials,

26  and patching compounds, and in particular was aware that at certain times its asbestos-containing

27  products were in direct competition with asbestos-free compounds. For example, on March 28,

28

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1   1975, Kelly-Moore managing agent Doug Marquardt reported that competitor Hamilton produced

2   a successful acoustic compound.

3       g)     Kelly-Moore continued to use asbestos in its joint compounds and other products

4   despite knowing that asbestos posed a hazard to its own employees. For example, at an internal

5   "Paco Production Meeting" on February 28, 1972, Kelly-Moore concluded that the "latest

6   bulletin" on the use of asbestos in joint compound and paint products meant that "we will not have

7   to eliminate it from our formulations immediately; however, it will be necessary for us to provide

8   proper respirator devices for the men and have lung X-rays made of the workers at least once each

9   two years." Douglas W. Merrill, then Kelly-Moore's Research and Production Manager, was one

10  of the many Kelly-Moore managing agents present at this meeting.

11      h)     Walter Pickens, president of Kelly-Moore division Paco Textures, received a letter

12  from Bill Spence, chairman of the Drywall Industry Trust Fund Safety Committee on June 6, 1972

13  discussing Dr. Irving Selikoff's three-year study of the effects of dust on workers in the sheetrock

14  industry. As noted in the letter Mr. Pickens received, these studies found that after only seven

15  years in the trade, drywall tapers were "quite susceptible to cancer of the lung within the next ten

16  year period". The letter was circulated to Douglas Merrill, and includes hand-written notes

17  (presumably from Mr. Merrill) to Mr. Pickens acknowledging that the "materials claimed as toxic

18  used in drywall products would be asbestos".

19      i)     Despite receiving this letter in 1972, Kelly-Moore has previously denied receiving

20  the results or conclusions of any studies or tests conducted by any laboratory relating to asbestos

21  exposure in the workplace or the hazards of asbestos to human health prior to 1973.

22      j)     On July 7, 1972, Kelly-Moore received an "Evaluation of Airborne Asbestos" from

23  Liberty Mutual, its workers' compensation insurer, which found that levels of asbestos present at

24  Kelly-Moore's manufacturing facility exceeded then-existing OSHA standards. The first

25  recommendation presented to Kelly-Moore was: "Explore the possibility of finding a suitable and

26  less toxic substance for asbestos in the various mixtures." In addition to industrial hygiene and

27  engineering controls, Kelly-Moore was advised to implement "special medical controls" for

28  employees exposed to airborne asbestos.

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

Kazan, McClain, Satterley & Greenwood

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

k)      By 1974, Kelly-Moore knew that the concentration of airborne asbestos created by the regular use of its asbestos-containing joint compounds exceeded OSHA's ceiling concentration limits; nonetheless, Kelly-Moore continued to sell asbestos-containing products.

l)      On September 30, 1974, Kelly-Moore held a board meeting at managing agents including Doug Merrill were present. Kelly-Moore decided that the use of asbestos as a substitute for titanium in an acoustic compound "has resulted in a lower cost for us; therefore it has been agreed that we will make this change in the formula and not indicate it on the bag."

m)      As of July 1, 1975, it became illegal in California to spray any substance containing .5% asbestos on a building during construction; this ban would extend to the spraying of a substance containing any amount of asbestos by July 1, 1976. This ban encompassed certain Kelly-Moore products, including ceiling texture. Kelly-Moore did not remove asbestos from this product, recall the product, or warn customers to stop using it. Instead, after a meeting on March 28, 1975, Kelly-Moore instituted a program where the "old product" that did not comply with these regulations would be sold outside of California.

n)      Kelly-Moore told its "California customers" that it would comply with the law and make a non-asbestos product available to them. In an internal memo circulated among managing agents on June 25, 1975, Kelly-Moore noted that "customers can still continue to use the products purchased prior to July 1 – we just cannot sell them after July 1." Meanwhile, Kelly-Moore instructed stores and warehouses in California to return inventory of this asbestos-containing ceiling texture so that it could be sold in other states.

o)      In a December 15, 1976 internal memo authored by Doug Merrill, Kelly-Moore acknowledged that in addition to anticipated consumer bans on the use of asbestos, "we could be judged liable in a suit where a person exposed to our asbestos containing product developed a cancer related injury or death." Nonetheless, Kelly-Moore acknowledged that it continued to make an asbestos-containing ceiling texture for "out-of-state customers", and intended to continue marketing this asbestos-containing products until anticipated state and federal regulations prevented it from doing so, stating that it believed Kelly-Moore salesman and some customers might feel an asbestos-free product was "insuperior".

p)      Through correspondence it obtained from the Asbestos Information Association in 1976, Kelly-Moore was aware of the scientific basis for banning asbestos from construction products, and the dangers it posed to workers, including:

- The use of asbestos-containing patching compounds emits high quantities of asbestos fibers
- Even brief exposures to asbestos fibers from patching compounds substantially increase the exposed person's risk of cancer
- Breathing-zone measurements of drywall workers show levels of asbestos up to 12 times greater than existing OSHA standards
- Workers with intermittent exposures to asbestos still incur a very high rate of cancer
- Workers exposed to levels of asbestos much lower than those found in drywall work develop asbestos cancers

q)      In response to proposed federal regulations intended to ban asbestos in joint and patching compounds sold for consumer use, Kelly-Moore attempted to get its asbestos-containing products exempted from any restrictions or ban so that it could continue to market them. Kelly-Moore managing agent Douglas W. Merrill, in his capacity as Kelly-Moore's Research and Production Manager, wrote to the Secretary of the Consumer Product Safety Commission on August 22, 1977, urging the Secretary to exempt products "made for commercial or professional use" from an asbestos ban, arguing that the proposed ban "would effect [sic] all of our Joint Compound business even though it is almost entirely sold to the professional market."

r)      In 1977, Kelly-Moore continued to manufacture asbestos-containing ceiling texture for sale outside of California, including in the states of Texas and Oklahoma, reflecting in a November 22, 1977 production meeting that it did so because the non-asbestos formulation was "considerably more expensive".

s)      Kelly-Moore did not remove asbestos from its joint compounds and cements until it was required to comply with federal government issued regulations banning asbestos in patching //

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

compounds. Prior to this time, Kelly-Moore continued to produce over 25 separate asbestos-containing drywall products.

t)      Kelly-Moore continued to sell its existing inventory of asbestos-containing products to beat deadlines which would have prohibited its sales of those products, despite being well aware of the hazards asbestos and asbestos-containing compounds posed to users of those products. On June 1, 1978, Kelly-Moore management formally directed its district managers to sell its existing asbestos-containing compounds before the federal law banning sales of these products came into effect on June 16, and authorized those managers to "discount as necessary to sell the products within the prescribed time".

u)      Kelly-Moore continued to sell asbestos-containing products in its inventory whenever it believed it could do so without violating federal laws. On June 29, 1978, Kelly-Moore advised its Texas Division store managers – whose stores were of course not subject to the more stringent California regulations – that an internal directive to remove asbestos-containing compounds from store inventory "was issued to comply with the Federal Laws which became effective June 16, 1978", and that "the laws do not cover Ceiling Textures, Wall Textures, Sand Finish Textures or Texture Paints"; store managers were thus directed to place those items back in stock "and advise your staff that these items are now legal for sale."

Further, Kelly-Moore owed Plaintiff a duty to disclose facts regarding the asbestos hazards of Kelly-Moore's products because Kelly-Moore was in an indirect commercial relationship with Plaintiff, his employers, and other trades at the jobsites, whereby they purchased Kelly-Moore's products.

**X**.

**Additional Allegations as to VANDERBILT MINERALS, LLC, sued individually, as alter-ego of, and as successor-in-interest to R.T. VANDERBILT COMPANY, INC. and INTERNATIONAL TALC COMPANY, INC.**: The following facts are illustrative, but not exhaustive, of Vanderbilt's wrongful conduct.

a)      Vanderbilt knew that its talc contained high levels of asbestos, but hid this information from its customers to prevent loss of sales. Prior to the passage of the 1972 OSHA

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

Kazan, McClain, Satterley & Greenwood

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

asbestos regulations, Vanderbilt proudly advertised that its talc contained almost one-third asbestos.  Vanderbilt started the Gouverneur talc operations in 1948. NYTAL talc was mined in upstate New York by the Gouverneur Talc Company.

b)  In its 1966 50th Anniversary Book, Vanderbilt stated that its product "must not be confused with pure mineral talc." "NYTAL is the trade name of the talc as produced by the Gouverneur Talc Company, Inc., subsidiary of the R.T. Vanderbilt Company, New York, NY." Vanderbilt stated that its talc was a "New York tremolite talc," with tremolite being one of its three principal minerals (on the order of one-third). As to tremolite, Vanderbilt wrote that it "occurs in long prismatic crystals," and "asbestiform varieties are common."

c)  Thomas Rogers worked for the Gouverneur Talc Company from 1963 to 1988. From 1966 to 1988, he worked as a trammer below ground in the mine, bringing out the ore. Mr. Rogers was told by management, including the mine foreman, that the talc mines contained asbestos. Vanderbilt advertised its talc as "R.T. Vanderbilt, the Best Asbestos in the World."

d)  Vanderbilt believed that the 1972 OSHA asbestos regulations, requiring labeling of asbestos-containing products, would hurt its sales.  Mr. Thompson is a mineralogist who worked for Vanderbilt from 1972 to 1993. He "supervise[d]" the ceramics, papers, and specialties department, and rose to "supervision of research for all materials." The first OSHA asbestos emergency standard came out in 1972. Mr. Thompson went to Washington, D.C. to try to persuade OSHA that they had erred in their description of asbestos, and therefore the Vanderbilt talc did not contain asbestos. Vanderbilt petitioned OSHA and NIOSH to find that its talc contained "nonasbestiform tremolite." In 1976, Mr. Thompson received the 1976 NIOSH study concluding that there was asbestos in Vanderbilt's talc, and decided that NIOSH was wrong. This study found between 17%-60% tremolite asbestos in Vanderbilt's NYTAL talc.

e)  RT Vanderbilt believed that placing an asbestos warning on its talc would "hurt sales." "If it said it was asbestos it would hurt the company plenty, yeah." It would "cripple" the company "financially."

f)  In 1972, Mr. R.C. Bacon, the Director of the Vanderbilt Research and Development Division, wrote to the U.S. Bureau of Mines and stated that RT Vanderbilt is "not in accord with

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1   defining tremolite as an asbestos mineral." Vanderbilt asked the Bureau of Mines to further

2   investigate; otherwise Vanderbilt's talc would be subject to the OSHA asbestos regulations. Hugh

3   Vanderbilt, President of Vanderbilt, was carbon copied.

4        g)     In 1973, the Tile Council of America wrote to Mr. Bacon, and stated that "there is

5   no question but that the domestic ceramic wall tile industry will be seriously injured if OSHA

6   requires tremolite talc to be classified and handled as a toxic asbestos material."

7        h)     Mr. Erdman, Vice President of Gouverneur Talc Company, wrote to all employees

8   in June 1976 that "[o]ur problems started in July 1972 when the Occupational Safety & Health

9   Administration (OSHA) developed a standard for regulating asbestos and mistakenly included our

10   talc minerals in the Asbestos Standard." "Both OSHA and the National Institute for Occupational

11   Safety & Health (NIOSH) have little or no expertise in minerals . . .We do not support OSHA in

12   their efforts to classify and regulate our talc materials as asbestos." "OSHA's failure to correct its

13   mistake has already seriously damaged our talc business and may eventually destroy it."

14        i)     Because labeling its product as asbestos-containing would hurt sales, Vanderbilt

15   called its talc "nonasbestiform." Vice President Paul Vanderbilt testified that in the early 1970's,

16   companies like Vanderbilt were concerned that OSHA would regulate talc under the asbestos

17   standard.  Thus, Vanderbilt did not change its material safety data sheet to warn of the hazards of

18   asbestos in its industrial talc even after it know that miners and millers were dying from

19   mesothelioma from its product. In May 1975, Vanderbilt's Mineral Product Safety Data Sheet for

20   its talc stated that it contained "Non-asbestiform tremolite and/or anthophyllite." It contained no

21   warnings as to cancer or asbestos.

22        j)     Vanderbilt received repeated tests from its own hired scientists that its talc

23   contained asbestos, yet Vanderbilt denied that its talc contained asbestos.  In 1974, Dr. Rohl and

24   Dr. Langer published an article in the peer-reviewed literature, which concluded that Vanderbilt's

25   Gouverneur talc contained asbestos. In at 1973 talc symposium that Mr. Thompson attended,

26   Dr. Langer gave a speech concluding that RT Vanderbilt's Gouverneur talc contains asbestos.

27        k)     In 1975, Mr. Lamar, Manager of Johns-Manville's Filtration and Minerals

28   Division, met with H.B. Vanderbilt, President of Vanderbilt, and informed him that Johns-

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1 Manville had tested Vanderbilt's talc, and found asbestos. Johns-Manville wrote that this affected

2 its position with respect to "talc labeling."

3         l)      In May 1975, the McCrone Laboratories, which Dr. Thompson had hired to test

4 Vanderbilt's talc, wrote to Dr. Thompson and reported that "Over half of the fiber content,

5 however, was amphibolic, apparently mainly of the tremolite and anthophyllite family." The

6 McCrone Laboratories reported that the anthophyllite fibers were "classic asbestiform type." In

7 June 1975, the EMV Microanalysis Laboratory, which Dr. Thompson had also hired to test the

8 Vanderbilt talc, reported to Dr. Thompson that "It is entirely possible that tremolite is present

9 within the talc." That same month, Vanderbilt's Mineral Product Safety Data Sheet for its talc

10 stated that it contained "Non-asbestiform tremolite and/or anthophyllite." It contained no warnings

11 as to cancer or asbestos.

12         m)     In 1976, the United States Department of the Interior wrote to Mr. George Erdman,

13 Vice-President of the Gouverneur Talc company, and reported that it measured exposures to

14 asbestos fibers from the Vanderbilt talc laborers. The "fiber concentration . . .exceeds the currently

15 enforced threshold limit value (TLV) of 5 fibers/ml for all forms of asbestos fibers . . ."

16         n)      NIOSH's final report on Vanderbilt's NYTAL talc concluded in 1976 that "Using

17 present 'state of the art' techniques for asbestos fiber analyses, all 7 talcs analyzed demonstrated

18 large quantities of asbestiform tremolite and anthophyllite . . ." Vanderbilt reviewed NIOSH's

19 conclusions, and contested whether it was even subject to jurisdiction from NIOSH and OSHA:

20 "As long as the Gouverneur operations come under MESA jurisdiction, we believe that only

21 MESA recommendations for specific actions are appropriate."

22         o)      Similar to Vanderbilt's asbestos-containing NYTAL talc, Vanderbilt also mined,

23 marketed, and sold its asbestos-containing Westal talc. Vanderbilt mined its Westal talc in

24 California, and then supplied that talc to manufacturers including, but not limited to, Kaiser

25 Gypsum and Kelly-Moore in California for use in their drywall joint compounds and textures –

26 specifically including Kaiser Gypsum's pre-mix topping compound, Cover-Tex wall texture, and

27 K-Spray ceiling texture.

28 //

p)      In 1977, Vanderbilt wrote all its customers and stated that OSHA had concluded that Vanderbilt could no longer "certify that our talc products do not contain asbestos . . ."

q)      Mr. Thompson conceded that in 1979, the Mine Safety Administration reported to Vanderbilt that it had found asbestos in its Gouverneur talc. They found the percentage of asbestos content ranging from 8.3% to 22.3%.

r)      In 1980, NIOSH published "Occupational Exposure to Talc Containing Asbestos." This report concluded that the Vanderbilt talc contained asbestos.

s)      In 1984, Vanderbilt's customer DAP reported to Vanderbilt that its testing revealed 35-40% asbestos  in its talc.

t)      Yet Vanderbilt advertised its talc as "uniform," without warning or informing its customers that it contained asbestos.

u)      In 1986, Vanderbilt's interoffice memorandum, copying Vice-President Paul Vanderbilt, noted that Dr. Jerrold Abraham had studied the lung tissues of Vanderbilt talc workers, and found them "loaded" with fibers; and further that he had found "a large percentage of asbestiform tremolite" in Vanderbilt talc.

v)      In May 1988, Vice President Mr. Erdman wrote to all employees that Vanderbilt would continue to resist any asbestos labeling on its talc products, because "We are certain that the prospect of labelling our product as asbestos as required by the OSHA regulations would lead to a rapid loss of our business. The public panic over asbestos is such that our operation could not survive the stigma attached to such a label."

w)      Despite overwhelming evidence that its talc contained asbestos, in 1990 Mr. Thompson, head of research for all of Vanderbilt's minerals, circulated a Vanderbilt inter-office memorandum, and copied President Hugh Vanderbilt, and misstated, "I can reconfirm that we have never found asbestos in the deposit."

x)      Vanderbilt knew that its workers were getting sick from asbestos diseases, yet still refused to label its talc as containing asbestos. In 1977, the Mining Enforcement and Safety Administration reported to Mr. Erdman, Vice President, that they had collected asbestos fiber samples from the Gouverneur talc mine, and "Health studies conducted by MESA and NIOSH

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1    have produced data that documents the presence of asbestiform mineral fibers in the No. 1 Mine

2    ore body and personal exposure data collected by MESA and NIOSH indicated possible

3    overexposure to asbestiform mineral fibers by mine and mill workers . . .” They also reported to

4    Mr. Erdman, Vice President, high levels of asbestos content in the talc in 1979.

5        y)      A 1980 morbidity study among talc miners and millers in New York found “pleural

6    thickening is significantly higher than chrysotile asbestos workers in Canada.” NIOSH reported

7    “All of the above studies of workers exposed to talc containing fibrous tremolite, fibrous

8    anthophyllite or anthophyllite asbestos have demonstrated an excess risk of both pneumoconiosis

9    and respiratory cancer.”

10       z)      Vanderbilt’s competitors labeled their talc as containing asbestos, explaining that

11   they had a difference in “conscience.” In 1974, when its competitor Johns-Manville decided to

12   label its talc as asbestos-containing, Bob Bacon, Assistant to the President of Vanderbilt, called

13   Johns-Manville and advised that its “talc labeling decision is causing a ‘big stink.’” Indeed, “RT

14   Vanderbilt Co. is of the opinion that it is Johns-Manville’s intention to hurt their company.”

15       aa)     “Mr. Bacon requested that this matter be brought to the attention of this highest

16   level of management, and he stated that he was asking Mr. Hugh Vanderbilt, President of R.T.

17   Vanderbilt, to call a senior officer at J-M to voice their concern and their belief that it is J-M’s

18   intention to hurt their company.” Johns-Manville concluded that Vanderbilt’s decision not to label

19   its talc as asbestos-containing “may very well be based on a distinct difference between their

20   ‘corporate conscience’ and ours.”

21       bb)     Mr. Vanderbilt, President of Vanderbilt, boasted he would avoid OSHA regulations

22   with millions of dollars and a senator “in his back pocket.” Mr. Rogers testified that Hugh

23   Vanderbilt, Sr., one of the executives for Vanderbilt, spoke to the carpenter shop in the late 1970’s

24   or early 1980’s, when Vanderbilt “was having quite a spell on whether they was going to be called

25   asbestos or not.” Mr. Vanderbilt explained that Vanderbilt had its own labs to test its industrial

26   talc “against NIOSH,” but “in the end if all else failed, he patted his back pocket, he says, I got a

27   Senator right here.” He explained that Vanderbilt would “spend millions of dollars on that issue.”

28   There was concern that if “it was declared asbestos, they’d have to close the mine.”

Kazan, McClain, Satterley & Greenwood

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607

(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

Kazan, McClain, Satterley & Greenwood

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607

(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

cc)     Mr. Fuller worked in the Number 1 mine as an underground laborer for Gouverneur Talc from 1964 to 1990. He testified that Hugh Vanderbilt spoke to the workers—"a very distinguished gentleman"—and told them he had spent approximately $16 million "to prove his point" that the talc did not contain asbestos, but "'If that doesn't work, I have a Senator in my hip pocket.' He literally patted his pocket."

dd)     Mine worker Mr. Minckler confirmed his co-workers' recollections of what Mr. Vanderbilt said: "He spent a lot of money trying to get this fiber, asbestos, or whatever he was calling this, taken care of. Spent 15, 20 million dollars on it. I guess he said if that didn't work he knew somebody that could help him out pretty good."

ee)     Vanderbilt attempted to obstruct NIOSH's efforts to test its talc. Mr. Rogers testified that NIOSH attempted to collect random samples to determine if there was asbestos in the talc mines, "[b]ut they never did." On the contrary, "management" told Mr. Rogers where specifically to collect the samples to give to NIOSH. Mr. Rogers was told to collect the samples from areas where the asbestos was not located, "just lime, high lime content mostly." The place where he collected the NIOSH samples was not "where the normal production of the talc was occurring at." He was not aware of any warnings or cautions provided with Vanderbilt industrial talc.

ff)     Vanderbilt continued to sell asbestos talc until 2008 without labeling it, despite knowing that NIOSH had concluded it contained asbestos. Vanderbilt was still selling the talc from the Gouverneur talc mines until 2008, without labeling it as containing asbestos.  Yet Vanderbilt knew that scientists testing this talc for NIOSH in 1975 reported: "In answer to the specific question, "Do these particular talc samples contain any asbestos minerals?', the answer must be an unequivocal yes." "The asbestos content in the samples varies from less than 5% to approximately 20%, based on occluded areas observed in the transmission electron microscope." Vice-President Mr. Paul Vanderbilt conceded that NIOSH concluded in 1976 and 1980 that the minerals in the Gouverneur talc operations contained asbestos.

gg)     Vanderbilt provided its own employees with respirators and medical examinations, but did not inform its customers that its talc contained asbestos. Mr. Rogers testified that the

1  company provided its employees with canister respirators. Mine worker Charles Minckler testified

2  that Vanderbilt gave its own employees physicals, chest x-rays, and required them to wear

3  respirators. Paul Vanderbilt, Vice President, testified that Vanderbilt workers were required to

4  wear respirators in the mines.

5     Further, Vanderbilt owed Plaintiff a duty to disclose facts regarding the asbestos hazards of

6  Vanderbilt's products because Vanderbilt was in an indirect commercial relationship with

7  Plaintiff, his employers, and other trades at the jobsites, whereby they purchased products that in

8  turn contained Vanderbilt's products.

9  **FIRST CAUSE OF ACTION FOR STRICT PRODUCTS LIABILITY**

10  **I**.

11     Plaintiffs hereby incorporate by reference the allegations in the General Background

12  section of this Complaint as if fully stated herein.

13  **II**.

14     **Design Defect**: The Products Liability Defendants, and the 1st through 100th Doe

15  Defendants, are strictly liable, under the consumer-expectations test, for placing defectively

16  designed products into the stream of commerce, ultimately exposing Plaintiff to asbestos from

17  these products. First, Defendants designed, manufactured, supplied, marketed, distributed, and

18  sold the products. Second, each product did not perform as safely as an ordinary consumer would

19  have expected it to perform when used or misused in an intended or reasonably foreseeable way,

20  because each product caused hazardous asbestos to become airborne, exposing Plaintiff to

21  asbestos. Third, Plaintiff developed mesothelioma. Fourth, each product's failure to perform safely

22  was a substantial factor in causing Plaintiff's mesothelioma.

23  **III**.

24     **Failure-to-Warn Defect**: The Products Liability Defendants, and the 1st through 100th

25  Doe Defendants, are strictly liable for placing products with failure-to-warn defects into the stream

26  of commerce, ultimately exposing Plaintiff to asbestos from these products. First, Defendants

27  designed, manufactured, supplied, marketed, distributed, and sold the products. Second, each

28  product had potential risks that were known or knowable in light of the scientific and medical

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

knowledge that was generally accepted in the scientific community at the time of design, manufacture, supply, marketing, distribution, and sale. Third, the potential risks presented a substantial danger when each product was used or misused in an intended or reasonably foreseeable way, because each product caused hazardous asbestos to become airborne. Fourth, ordinary consumers would not have recognized the potential risks. Fifth, Defendants failed to adequately warn or instruct of the potential risks. Sixth, Plaintiff developed mesothelioma. Seventh, the lack of sufficient warnings or instructions was a substantial factor in causing Plaintiff's mesothelioma.

## SECOND CAUSE OF ACTION FOR NEGLIGENCE

### I.

Plaintiffs hereby incorporate by reference the allegations in the General Background section of this Complaint as if fully stated herein.

### II.

**General Negligence**: The Conduct Defendants, and the 1st through 100th Doe Defendants, are liable for their general negligence. First, Defendants failed to use reasonable care to prevent harm to others because they caused hazardous asbestos to become airborne, through Defendants' active participation and contribution to specific activities that caused asbestos to become airborne. Second, Defendants did so by unreasonably acting and failing to act. They acted in ways that a reasonably careful person would not do in the same situation, and failed to act in ways that a reasonably careful person would do in the same situation. Third, Plaintiff developed mesothelioma. Fourth, each Defendant's general negligence was a substantial factor in causing Plaintiff's mesothelioma.

### III.

**Negligence Per Se**: The Conduct Defendants, and the 1st through 100th Doe Defendants, are liable for negligently violating the applicable state and federal asbestos regulations. Defendants negligently violated those regulations by failing to properly label asbestos-containing products; failing to monitor for the presence of asbestos dust; failing to provide changing facilities and showers to exposed persons; allowing exposures of asbestos to exceed permissible exposure

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1  limits; failing to warn as to the presence of asbestos; and failing to implement industrial hygiene

2  practices to eliminate or decrease exposures to asbestos. Those violations were a substantial factor

3  in causing Plaintiff's exposure to asbestos, and in causing Plaintiff's mesothelioma. The

4  regulations were designed to prevent overexposure to asbestos dust, and Plaintiff was within the

5  class of persons that the regulations were designed to protect. Accordingly, because Defendants

6  violated the regulations, Defendants' conduct is presumed to have been negligent.

7  **IV**.

8  **Negligent Design, Marketing, Sale, Supply, Installation, Inspection, Repair, and**

9  **Removal of Products**: The Conduct Defendants, and the 1st through 100th Doe Defendants, are

10  liable for their negligent design, marketing, sale, supply, installation, inspection, repair, and

11  removal of products. First, Defendants designed, marketed, sold, supplied, installed, inspected,

12  repaired, and removed the products. Second, Defendants were negligent in designing, marketing,

13  selling, supplying, installing, inspecting, repairing, and removing the products because the

14  products released hazardous asbestos, which became airborne. Defendants failed to use the amount

15  of care that a reasonably careful person would use in similar circumstances to avoid exposing

16  others to a foreseeable risk of harm. Third, Plaintiff developed mesothelioma. Fourth, each

17  Defendant's negligence was a substantial factor in causing Plaintiff's mesothelioma.

18  **V**.

19  **Negligent Failure to Warn about Products**: The Conduct Defendants, and the 1st

20  through 100th Doe Defendants, are liable for their negligent failure to warn about their products.

21  First, Defendants designed, manufactured, supplied, marketed, distributed, and sold the products.

22  Second, Defendants knew or reasonably should have known that each product was dangerous or

23  was likely to be dangerous when used or misused in a reasonably foreseeable manner, because

24  each product caused hazardous asbestos to become airborne. Third, Defendants knew or

25  reasonably should have known that users would not realize the danger. Fourth, Defendants failed

26  to adequately warn of the danger or instruct on the safe use of each product. Fifth, a reasonably

27  careful person under the same or similar circumstances would have warned of the danger or

28  instructed on the safe use of each product. Sixth, Plaintiff developed mesothelioma. Seventh, each

1  Defendant's negligent failure to warn or instruct was a substantial factor in causing Plaintiff's

2  mesothelioma.

3  **VI**.

4  **Negligent Failure to Recall and Retrofit Products**: The Conduct Defendants, and the 1st

5  through 100th Doe Defendants, are liable for their negligent failure to recall and/or retrofit their

6  products. First, Defendants designed, manufactured, supplied, marketed, distributed, and sold the

7  products. Second, Defendants knew or reasonably should have known that each product was

8  dangerous or was likely to be dangerous when used in a reasonably foreseeable manner, because

9  each product caused hazardous asbestos to become airborne. Third, Defendants became aware of

10  this defect after they placed each product into the stream of commerce. Fourth, Defendants failed

11  to recall and/or retrofit each product. Fifth, a reasonably careful person under the same or similar

12  circumstances would have recalled and/or retrofitted each product. Sixth, Plaintiff developed

13  mesothelioma. Seventh, each Defendant's negligent failure to recall and/or retrofit each product

14  was a substantial factor in causing Plaintiff's mesothelioma.

15  **VII.**

16  **Negligent Hiring, Supervision, and Retention of Employees**: The Conduct Defendants,

17  and the 1st through 100th Doe Defendants, are liable for their negligent hiring, supervision, and

18  retention of employees.  First, Defendants' employees were unfit and incompetent to perform the

19  work for which they were hired.  Second, Defendants knew or should have known that their

20  employees were unfit and incompetent, and that this unfitness and incompetence created a

21  particular risk to others because they caused hazardous asbestos to become airborne by, among

22  other things, actively participating and contributing to specific activities such as, but not limited

23  to, moving, mixing, tearing down, and installing asbestos-containing products in an unsafe

24  manner; and specifying and causing others to move, mix, tear down, and install asbestos-

25  containing products in an unsafe manner.  Third, Plaintiff developed mesothelioma.  Fourth, each

26  Defendant's negligence in hiring, supervising, and retaining its employees was a substantial factor

27  in causing Plaintiff's mesothelioma.

28  //

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

Kazan, McClain, Satterley & Greenwood

A Professional Law Corporation

Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

**VIII**.

**Negligent Management of Property**: The Conduct Defendants, and the 1st through 100th Doe Defendants, are liable for their negligent management of property.  First, Defendants owned, leased, occupied, or controlled the property.  Second, Defendants were negligent in the use or maintenance of the property, because they caused hazardous asbestos to become airborne by, among other things, actively participating and contributing to specific activities such as moving, mixing, tearing down, and installing asbestos-containing products in an unsafe manner; and specifying and causing others to move, mix, tear down, and install asbestos-containing products in an unsafe manner.  Defendants failed to use the amount of care that a reasonably careful person would use in similar circumstances to avoid exposing others to a foreseeable risk of harm.  Third, Plaintiff developed mesothelioma.  Fourth, each Defendant's negligence was a substantial factor in causing Plaintiff's mesothelioma.

**IX**.

**Negligent Failure to Warn of Unsafe Concealed Conditions**: The Conduct Defendants, and the 1st through 100th Doe Defendants, are liable for their negligent failure to warn of unsafe concealed conditions.  First, Defendants owned, leased, occupied, or controlled the property.  Second, Defendants knew, or reasonably should have known, of a preexisting unsafe concealed condition on the property: the existence of hazardous asbestos that became airborne. Third, exposed persons neither knew nor could be reasonably expected to know of the unsafe concealed condition.  Fourth, when Plaintiff worked as a contractor's employee, the condition was not part of the work that Plaintiff was hired to perform.  Fifth, Defendants failed to warn exposed persons of the condition.  Sixth, Plaintiff developed mesothelioma.  Seventh, each Defendant's negligent conduct was a substantial factor in causing Plaintiff's mesothelioma.

**X**.

**Negligent Exercise of Retained Control over Safety Conditions**: The Conduct Defendants, and the 1st through 100th Doe Defendants, are liable for their negligent exercise of retained control over safety conditions.  First, Defendants owned, leased, occupied, or controlled the property. Second, Defendants retained control over safety conditions at the worksite.  Third,

1  Defendants negligently exercised their retained control over safety conditions because they caused

2  hazardous asbestos to become airborne by, among other things, actively participating and

3  contributing to specific activities such as, but not limited to, moving, mixing, tearing down, and

4  installing asbestos-containing products in an unsafe manner; and specifying and causing others to

5  move, mix, tear down, and install asbestos-containing products in an unsafe manner.  Fourth,

6  Plaintiff developed mesothelioma.  Fifth, each Defendant's negligent exercise of its retained

7  control over safety conditions was a substantial factor in causing Plaintiff's mesothelioma.

8  **XI.**

9  **Negligent Provision of Unsafe Equipment**: The Conduct Defendants, and the 1st through

10  100th Doe Defendants, are liable for their negligent provision of unsafe equipment.  First,

11  Defendants owned, leased, occupied, or controlled the property.  Second, Defendants negligently

12  provided unsafe equipment that caused hazardous asbestos to become airborne.  Third, Plaintiff

13  developed mesothelioma.  Fourth, each Defendant's negligent conduct was a substantial factor in

14  causing Plaintiff's mesothelioma.

15  **THIRD CAUSE OF ACTION FOR DANGEROUS CONDITION OF PUBLIC PROPERTY**

16  **I.**

17  Defendant CITY OF LONG BEACH is liable for harm caused by the dangerous condition

18  of its public property – the *RMS Queen Mary* – pursuant to Government Code sections 830, 835,

19  and 835.2.

20  **II**.

21  This Complaint is authorized because Plaintiffs satisfied the government-claim

22  requirements of Government Code section 945, *et seq*.  On September 26, 2023, Plaintiffs

23  submitted their Claim for Damages by mailing the completed form to the designated office.  CITY

24  OF LONG BEACH did not approve Plaintiffs' claim within 50 days, so the claim is deemed

25  denied and Plaintiffs are permitted to file suit.

26  **III**.

27  As to Plaintiffs, CITY OF LONG BEACH owed and breached the duties of care that are

28  specified in statutes including the following:

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1    • Government Code sections 830, 835, and 835.2;

2    • Civil Code sections 1708, 1709, 1710, 1711, 1714, and 3479; and

3    • Labor Code sections 3300, 6302 through 6305, 6310, 6311, and 6400 through 6404.

4    In sum, CITY OF LONG BEACH owned, controlled, and/or managed the *RMS Queen*

5 *Mary*, including when that ship was being converted into a floating museum and tour area.  Due to

6 CITY OF LONG BEACH's unreasonable actions and failures to act, Plaintiff's and others' work

7 aboard the *RMS Queen Mary* exposed Plaintiff to asbestos that was a substantial factor in causing

8 his mesothelioma.

9    **IV**.

10    From the late 1960's through early 1970's, the *RMS Queen Mary* premises was in a

11 dangerous condition that created a substantial known and reasonably knowable risk of the type of

12 asbestos-related cancer that Plaintiff has now developed.  Plaintiff in the course of his work used

13 the premises in a manner that CITY OF LONG BEACH knew or should have foreseen it would be

14 used, in that CITY OF LONG BEACH caused to have asbestos and asbestos-containing products

15 specified, installed, used, inspected, maintained, repaired, removed, and replaced at the premises,

16 which CITY OF LONG BEACH actually knew or, in the exercise of its duty of care owed to

17 Plaintiff, should have known created dangerous and hazardous conditions of public property,

18 within the meaning of Government Code section 830, *et seq.*, to which Plaintiff was foreseeably

19 exposed. The dangerous and hazardous conditions of this public property has continued thereafter

20 for decades about the *RMS Queen Mary*.

21    **V.**

22    Pursuant to Government Code section 835, from at least the 1960's, CITY OF LONG

23 BEACH had actual or constructive notice of the existence of the above-described conditions and

24 knew or should have known of their dangerous character a sufficient time prior to the dates upon

25 which Plaintiff was exposed thereto in order to have taken measures to protect against, or warn of,

26 the dangerous conditions.  Asbestos and asbestos-containing products were specified, installed,

27 used, inspected, maintained, repaired, removed, and replaced at the above-described premises at

28 CITY OF LONG BEACH's behest and instruction.  CITY OF LONG BEACH's employees and

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1  contractors directed, performed, supervised, inspected, and approved activities and work that

2  released significant levels of airborne asbestos fibers.

### VI.

4      At all relevant times, CITY OF LONG BEACH failed to make reasonable, adequate or

5  sufficient inspections of its own property or property within its custody or control, which caused

6  CITY OF LONG BEACH to negligently and wrongfully fail to determine whether the property

7  complied with or violated any legislative or regulatory enactments, or contained or constituted any

8  hazard to health and safety within the meaning of Government Code section 830, *et seq.*

### VII.

10     At all relevant times, CITY OF LONG BEACH failed to protect against the

11  aforementioned unreasonably dangerous conditions on CITY OF LONG BEACH's premises, in

12  that it failed to avoid, repair, remedy, or correct the dangerous conditions; failed to provide

13  safeguards against the dangerous conditions; and failed to warn of the dangerous conditions,

14  which failures were the legal cause of Plaintiff's injuries as previously alleged herein.

### VIII.

16  At all relevant times, CITY OF LONG BEACH owed a duty under Civil Code section 3479 to

17  prevent, remedy, repair, and abate any condition which was injurious to health or offensive to the

18  senses, or an obstruction to the free use of property, so as to interfere with the comfortable

19  enjoyment of life; and CITY OF LONG BEACH knew, by and through its agents, employees,

20  departments and research, that asbestos was dangerous and injurious to human health. CITY OF

21  LONG BEACH breached its duties, and thereby created a nuisance and caused injuries to Plaintiff.

### **FOURTH CAUSE OF ACTION FOR FRAUD**

### **I.**

24     Plaintiffs hereby incorporate by reference the allegations in the General Background

25  section of this Complaint as if fully stated herein.

### **II.**

27     All Defendants, and the 1st through 100th Doe Defendants, except for KAISER GYPSUM

28  COMPANY, INC., are liable for fraud, including fraudulent misrepresentation, fraudulent

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

concealment, conspiracy to commit fraudulent misrepresentation, and conspiracy to commit fraudulent concealment, as set forth herein.

**III**.

**Fraudulent Misrepresentation:** All Defendants, and the 1st through 100th Doe Defendants, are liable for their fraudulent misrepresentations.

First, each Defendant, via its employees, agents, advertisements, or any other authorized person or document, represented that certain facts were true when they were not.

Second, each Defendant falsely represented that the products they marketed, used, sold, supplied, or specified for use were not hazardous; and/or that each Defendant's conduct did not create serious or deadly dust hazards. Those misrepresentations were made before and during the years that Plaintiff was exposed to asbestos for which Defendants are responsible. Those misrepresentations were made either directly to Plaintiff, to a group of persons including Plaintiff, or to third parties intending and reasonably expecting that the substance of those misrepresentations would be repeated to Plaintiff.

Third, each Defendant knew that the misrepresentations were false when they made them, or Defendants made the misrepresentations recklessly and without regard for the truth.

Fourth, each Defendant intended that Plaintiff and/or the same class of persons would rely on the misrepresentations or their substance.

Fifth, Plaintiff and others reasonably relied on Defendants' misrepresentations or their substance.

Sixth, Plaintiff developed mesothelioma.

Seventh, Plaintiff's and others' reliance on each Defendant's misrepresentations or their substance was a substantial factor in causing Plaintiff's mesothelioma.

**IV**.

**Fraudulent Concealment:** All Defendants, and the 1st through 100th Doe Defendants, are liable for their fraudulent concealment.

First, each Defendant made affirmative statements that were so misleading (e.g., misleading "half-truths") that they gave rise to a fraud cause of action even in the absence of a

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1   specific relationship or transaction as between Defendants and Plaintiff. Specifically, Defendants

2   stated that their products could be used safely while concealing that they were, in fact, lethal

3   because they released asbestos fibers; and/or Defendants stated that their conduct did not create

4   serious or deadly dust hazards, while concealing that Defendants' conduct in fact created risks of

5   asbestos-related cancer.

6          Second, each Defendant (i) had exclusive knowledge of material facts not known to

7   Plaintiff and others, (ii) actively concealed these material facts from Plaintiff and others, (iii) made

8   partial representations but also suppressed material facts, as set forth above, and (iv) made factual

9   representations, but did not disclose facts that materially qualified those representations. Such

10  nondisclosures included Defendants representing their products as safe when used as intended and

11  as fit for the particular purpose for which they were marketed, while not disclosing the facts that

12  these products contained asbestos that would become airborne during the intended and/or

13  foreseeable use of the products, rendering them dangerous and unfit for their intended purpose.

14         Third, each Defendant entered into a relationship and/or a transaction with Plaintiff and

15  others sufficient to give rise to a duty to disclose. For example, Plaintiff and others used or

16  otherwise encountered Defendants' products that were purchased either directly from Defendants,

17  Defendants' authorized dealer or supplier, or any other entity upon which Defendants derived a

18  direct monetary benefit. Defendants derived direct monetary benefit from the industry and these

19  individuals' use of these products because Plaintiff and others decided to use or purchase

20  Defendants' products. Defendants also had a sufficient relationship with Plaintiff because their

21  employees' conduct at the relevant jobsites directly and indirectly caused Plaintiff's exposures to

22  asbestos.

23         Fourth, Plaintiff and others did not know of the concealed facts.

24         Fifth, Defendants intended to deceive Plaintiff and others by concealing the facts, and/or

25  making certain representations without disclosing additional facts that would have materially

26  qualified those representations.

27         Sixth, had the omitted information been disclosed, Plaintiff and others reasonably would

28  have behaved differently.

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

**Kazan, McClain, Satterley & Greenwood**
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

1    Seventh, Plaintiff developed mesothelioma.

2    Eighth, each Defendant's concealment was a substantial factor in causing Plaintiff's

3    mesothelioma.

4    **V**.

5    **Conspiracy to Commit Fraudulent Misrepresentation**: All Defendants, and the 1st

6    through 100th Doe Defendants, are liable for their conspiracy to commit fraudulent

7    misrepresentation. First, Defendants were aware that their conspirators, which included all co-

8    Defendants and others, planned to commit fraudulent misrepresentation against Plaintiff and

9    others. Second, Defendants agreed with their conspirators and intended that the fraudulent

10   misrepresentation be committed. Third, Plaintiff developed mesothelioma. Fourth, each

11   Defendant's participation in the conspiracy was a substantial factor in causing Plaintiff's

12   mesothelioma.

13   **VI**.

14   **Conspiracy to Commit Fraudulent Concealment**: All Defendants, and the 1st through

15   100th Doe Defendants, are liable for their conspiracy to commit fraudulent concealment. First,

16   Defendants were aware that their conspirators planned to commit fraudulent concealment against

17   Plaintiff and others. Second, these Defendants agreed with their conspirators and intended that the

18   fraudulent concealment be committed. Third, Plaintiff developed mesothelioma. Fourth, each

19   Defendant's participation in the conspiracy was a substantial factor in causing Plaintiff's

20   mesothelioma.

21   **BASIS FOR PUNITIVE DAMAGES**

22   **I**.

23   **Malice, Oppression, or Fraud**: Plaintiffs hereby incorporate by reference the allegations

24   in the General Background section of this Complaint, as well as the allegations of all causes of

25   action, as if fully stated herein. All Defendants, and the 1st through 100th Doe Defendants, except

26   for CITY OF LONG BEACH (because it is a public entity) and Defendant KAISER GYPSUM

27   COMPANY, INC. (because of the applicable bankruptcy-court order), are liable for punitive

28   damages because they engaged in the conduct that caused Plaintiff's harm with malice,

oppression, or fraud.

First, Defendants committed malice in that they acted with intent to harm when they caused Plaintiff's asbestos exposures, and because their conduct was despicable and was done with a willful and knowing disregard for the rights and safety of others.

Second, Defendants committed oppression in that their conduct was despicable and subjected Plaintiff to cruel and unjust hardship in knowing disregard of Plaintiff's rights.

Third, Defendants committed fraud in that they intentionally concealed and misrepresented material facts and did so intending to harm Plaintiff.

Defendants' conduct constituting malice, oppression, or fraud was committed by, authorized by, or adopted by one or more officers, directors, or managing agents of each Defendant, who acted on behalf of each Defendant.

## **PRAYER FOR DAMAGES**

### **I**.

Plaintiffs pray for judgment against all Defendants, and the 1st through 100th Doe Defendants, for:

1.    All economic and non-economic compensatory damages in excess of $25,000;

2.    Punitive damages according to proof, except as to KAISER GYPSUM COMPANY, INC. and CITY OF LONG BEACH;

3.    Pre- and post-judgment interest;

4.    Costs of suit; and

5.    Such other relief as is fair, just, and equitable.

//
//
//
//
//
//

Kazan, McClain, Satterley & Greenwood
A Professional Law Corporation
Jack London Market • 55 Harrison Street, Suite 400 • Oakland, California 94607
(510) 302-1000 • Fax: (510) 835-4913 • www.kazanlaw.com

**<u>DEMAND FOR JURY TRIAL</u>**

**I.**

Plaintiffs hereby demand a trial by jury on all issues so triable.

DATED:  November 20, 2023                KAZAN, McCLAIN, SATTERLEY & GREENWOOD
A Professional Law Corporation

By:  _____

Henry A. Steinberg

Attorneys for Plaintiffs

Complaint for Personal Injuries and Loss of Consortium; Demand for Jury Trial